UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

......................................................................................................x

EFRAIN SANTIAGO

Docket No:

**COMPLAINT**

Plaintiff,

-against-                                                             JURY DEMAND

THE CITY OF NEW YORK, NEW YORK CITY POLICE
DEPARTMENT, BILL de BLASIO, Individually, as Mayor
of the City of New York, JAMES P. O'NEIL, Individually, as
Former Commissioner of the Police Department of the City of
New York, DERMOT SHEA, Individually, as the Commissioner
of the Police Department of the City of  New York

Defendants.

......................................................................................................x

The plaintiff, EFRAIN SANTIAGO (hereinafter "Plaintiff") by his attorney THE LAW

OFFICE OF JOHN A. SCOLA, PLLC., allege the following upon information and belief, against

THE CITY OF NEW YORK; the NEW YORK CITY POLICE DEPARTMENT (hereinafter

referred to as "NYPD" or "Department"), BILL DE BLASIO, Individually, as Mayor of the City of

New York, JAMES P. O'NEIL, Individually, as former Commissioner of the Police Department of

the City of New York, and DERMOT SHEA, Individually, as the Commissioner of the Police

Department of the City of New York.

## NATURE OF THE ACTION

1.  This is an action for compensatory, emotional and punitive damages to redress the past and future

    deprivation of rights secured to Plaintiff by Title VII of the Civil Rights Act of 1964 ("Title VII"),

    as amended, 42 U.S.C. §§ 2000e, et seq.; 42 U.S.C. §1983; 42 U.S.C. §1986, the Fourth and

    Fourteenth Amendments of the United States Constitution, the New York States Human Rights Law,

    New York Executive Law §§290 et seq.; New York City Local Law 59 of 1986,  New York City

1

Human Rights Law 8-107 and the New York State Constitution art. I §§ 6 and 12.

2. Defendants have engaged in a long standing pattern and practice of discrimination against Hispanic and African American officers on the basis of color, race and national origin but inter alia through unwarranted and overly severe disciplinary penalties, including but not limited to loss of vacation, suspension, termination, loss of pension and retaliatory conduct including but not limited to investigations, charges, informal and formal discipline, refusal of pension benefits to minority officers who have challenged the Department's discriminatory actions. The disciplinary process of the NYPD, although neutral on its face, has a disparate impact on minority officers. Defendants have treated Hispanic and African-American officers, including Plaintiff, differently than white (non-Hispanic) officer in the application of disciplinary rules and procedures.

3. Defendants have engaged in a long standing pattern and practice of violating their employees individual rights to privacy and unlawful search and seizure in violation of their employees' rights under the Fourth and Fourteenth Amendments to the United States Constitution and New York State Constitution art. §§ 6 and 12. The NYPD implemented a policy of illegally, through fraud and deceit, of issuing documents reported to be subpoenas to obtain private records of those in their employ despite never having a warrant nor justifiable basis to obtain said records and without the signature of a judge. The NYPD purposefully uses these deceitful practices to manipulate the recipient of the illegal subpoena to produce documents in violation the constitutional rights of their employees.

## JURISDICTION AND VENUE

4. The jurisdiction of this Court is invoked pursuant to 42 U.S.C. §2000e-5(f)(3), 28 U.S.C. §§ 1331 and 1343 (3), and 28 U.S.C. § 1367(a) for claims arising under the New York State Human Rights Law and the New York City Human Rights Law based on the doctrine of supplemental jurisdiction in that such claims arise from a common nucleus of operative fact, and are so intertwined with other matters pending before the Court as to make exercise of supplemental jurisdiction appropriate.

5.  Venue is properly placed in the Southern District of New York under 28 U.S.C.§1391(b) and 42 U.S.C. 2000e-5(f)(3) in that the central offices of Defendants are within this district, a substantial part of the events giving rise to this claim arose in this district and records relevant to the practices complained of herein are located in this district.

6.  Plaintiff has fully complied with all prerequisites to jurisdiction in this Court under Title VII. Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on August 14, 2019 (Charge #: 520-2019-05362). An initial right to sue letter was allegedly mailed to Plaintiff on September 26, 2019 but Plaintiff never received the notice. Plaintiff, a member of the United States Air Force, informed the EEOC on or about April 24, 2019 that he was scheduled to be deployed to the Middle East on May 4, 2020 and that they should direct all communication to his attorneys, THE LAW OFFICE OF JOHN A. SCOLA, PLLC. Following this communication Plaintiff first learned that he had not received the alleged previously issued right to sue letter. Following an explanation of the circumstances, the EEOC re-issued a right to sue letter on May 14, 2020.  A copy of the Right to Sue Letter is attached hereto as **Exhibit "A."**

7.  This lawsuit is commenced within ninety (90) days of the receipt by Plaintiff of his notice of right to sue from the EEOC.

## **PARTIES**

8.  Plaintiff Efrain Santiago is a Hispanic Male hired by the Defendant City of New York on August 31, 1998 as a police officer. He retired on October 19, 2018. Plaintiff was an experienced police officer with over 160 arrests at the time he retired. Plaintiff is a current member of the United States Air Force and is currently deployed in the Middle East.

9.  Defendant City of New York ("NYC" or "City") is and was at all times relevant hereto a municipal corporation duly organized and existing under the laws of the State of New York exercising governmental authority, Defendant is an employer as defined by Title VII and is an

employer subject to the New York State Human Rights Law and New York City Local Law , Defendant City of New York is a "person" for purposes of §§ 1981, 1983, 1985 and the Fourteenth Amendment of the U.S. Constitution. Defendant City of New York was or is the employer of Plaintiff and other named Defendants herein.

10. Defendant Police Department of the City of New York (hereinafter "NYPD" or "Department"), was and is a department, agency, bureau and/or subdivision of the Defendant City. Defendant NYPD is and was at all times relevant hereto, a local government agency of New York City and was or is the employer of all the individual Plaintiffs and Defendants herein.

11. Defendant WILLIAM de BLASIO is the Mayor of Defendant City. Upon information and belief, Defendant de BLASIO has routinely met with the Police Commissioner, First Deputy Police Commissioner, Deputy Commissioner of Legal Matters and other high ranking members of the New York City Police Department and set policy, and made recommendations relating to the disciplinary system and implementation of penalties. This Defendant knew or should have known of the discriminatory customs, practices, policies and wrongful acts of the Defendants described in this Complaint and condoned, ratified and/or authorized such conduct.

12. Defendant JAMES P. O'NEIL, was the Police Commissioner from September 2016 until November 2019, was an employee of Defendant City, and was the principal administrator of the Defendant NYPD during that time. He was responsible for the institution and application of the NYPD's employment policies, including its internal investigatory and disciplinary process. He is also responsible for ensuring that the employees of the NYPD do not deprive anyone of their rights secure by the Constitution and laws of the United States as well as the Constitution and laws of the State and City of New York. He had the final authority in all disciplinary matters. This Defendant knew or should have known of the discriminatory customs, practices, policies and wrongful acts of the Defendants described in this Complaint

and condoned, ratified and/or authorized such conduct.

13. Defendant DERMOT SHEA, has been the Police Commissioner from November 2019 to the present, is an employee of Defendant City, and is the principal administrator of Defendant NYPD. He is responsible for the institution and application of the NYPD's employment policies, including its internal investigatory and disciplinary process. He is also responsible for ensuring that the employees of the NYPD do not deprive anyone of their rights secured by the Constitution and laws of the United States as well as the Constitution and laws of the State and City of New York. He is the final authority in all disciplinary matters. This Defendant knew or should have known of the discriminatory customs, practices, policies and wrongful acts of the Defendants described in this Complaint and condoned, ratified and/or authorized such conduct.

## ALLEGATIONS OF FACT

14. Defendants have engaged in a pattern and practice of discrimination against Hispanic and African-American officers by, inter alia, disproportionately punishing minority officers compared to White officers.

### NYPD's Discriminatory Use of the Disciplinary System

15. The lowest form of discipline is the Minor Violation Log which is kept in each Precinct or other Command. These logs list offenses which are not reported to the Department as a whole. Typical offenses might be that shoes are not shined, or the officer appeared late for an assigned shift.

16. The next level of discipline is the Command Discipline ("CD"), which is still informal in that it takes place fully within the Precinct or other Command. The CD may be written by any supervisory officer at the rank of Sergeant or above. CD's are investigated and adjudicated solely by the Commanding Officer or his Executive Officer. In a typical precinct the rank of

the Commanding officer is Captain or above and the Executive Officer is a Captain.

17. CDs are used for minor infractions of departmental rules and regulations not deemed serious enough to require formal Charges and Specifications. The Commanding Officer has considerable discretion to issue or not issue CDs in connection with most minor infractions (Schedule A cases) and can impose a penalty of O to 5 days suspension or time deducted from vacation and/or change assignments, transfer, limit overtime, etc. In certain cases (e.g., loss of shield, loss of firearm, loss of departmental property) disciplinary action is required (Schedule B cases) but there is discretion as to whether a CD will be imposed (0 to 10 days suspension or time deducted from vacation) or formal Charges and Specifications brought. If a Commanding Officer proposes a penalty for a CD that exceeds what the officer involved believes is fair, the officer may reject the proposed discipline ("plea") and the alleged offense is forwarded to the Department Advocate's office. There is great pressure on officers to accept a "plea" at the Command level, because the penalty can be much greater (up to and including termination) if the matter goes to the Department Advocate and the Officer does not prevail at the subsequent hearing.

18. In or about 1988 a study was conducted by the NYPD Office of Equal Employment Opportunity on the use of CDs which found a substantial disparity in the treatment of white and minority officers. Upon information and belief, the study found minority officers were written up more frequently for minor disciplinary infractions (e.g., haircut, failure to sign out, improper uniform, etc.) and the penalties were more severe. Upon information and belief the report was never published because of its findings and conclusions.

19. In late 1992 a study in the 94th Precinct which focused on a three year period (1988, 1990 and 1992) found the same results -- more frequent discretionary CDs and greater penalties imposed on minority officers.

20. In or about 1997 a report on the issuance of CDs at the 19th Precinct prepared by a Professor at Pace University in connection with an individual employment case found that "An intentional pattern of discrimination in the use of disciplinary actions against minority police officers exists within the New York City Police Department. This discriminatory pattern appears to be permanent and well -settled [and]. . .is clearly manifested and wide-spread within the disciplinary system."

21. In addition to receiving proposed Charges and Specifications from the Precincts and other Commands, the Department Advocate's office may receive them from the Internal Affairs Bureau or other internal investigative bodies.

22. The Department Advocate' s office investigates charges sent to it, and a determination is made as to whether to issue Charges and Specifications, to be prosecuted by an Assistant Department Advocate either before a Trial Commissioner in the NYPD's Trial Room or at the administrative hearing office used for all other New York City employees, the Office of Administrative Trials and Hearings , commonly referred to as "OATH."

23. Upon information and belief, the Department Advocate's Office maintains a list of officers who are targeted for firing (previously called the "hit list") which disproportionately made up of Hispanic and African-American officers.

24. Upon information and belief, minority officers, including Plaintiff in this case, were terminated or forced to retire after trial for retaliatory reasons where the charges should not have been substantiated.

25. Upon information and belief, minority officers, including Plaintiff in this case, was terminated and/or forced to retire after trial for retaliatory reasons where the charges should not have been substantiated.

26. Upon information and belief, Hispanic and African American officers are more likely to be

issued Charges and Specifications for an infraction than a white officer who commits the same offense.

27. Upon information and belief, Hispanic and African American officers are more likely to receive a severe penalty for an infraction than a white officer who commits the same offense.

28. Other aspects of the investigation and disciplinary system can be and are used against targeted individuals. A type of interrogation officially described as Patrol Guide 118-9 but universally known as a "GO 15" was originally established as a protection for officers, to ensure that their side was heard in any investigation. Officers can be "GO 15'd" either as a witness or a subject.

29. Upon information and belief, officers are often told they are merely witnesses to an investigation but are then treated as a subject during questioning, and receive Charges and Specifications as a result.

30. Upon information and belief, officers who make charges that white officers have committed racist or other discriminatory acts are often made the subject of interrogations, discipline and charges while the White officers who commit those acts are not charged or disciplined, and if disciplined, receive less of a penalty then similarly situated White officers.

31. Upon information and belief, officers who defend themselves in a GO 15 are likely to have their charges increased by the addition of a charge that they made false statements in the interrogation.

32. Upon information and belief, Hispanic and African American supervisors who attempt to eliminate discrimination within their Commands are made the subject of CCRB and Internal Affairs charges by other officers, as well as disobeyed with impunity by their subordinates and at the most extreme put in physical danger by their subordinates. Thus, the disciplinary system is part and parcel of the pattern and practice of discrimination and the preservation of that pattern and practice within the NYPD.

33. Upon information and belief, the entire investigation and disciplinary system within the NYPD is a mechanism through which discrimination based on color, race and national origin is perpetuated rather than exposed and eradicated.

34. The NYPD commenced a study in 1998 which analyzed the disciplinary records of minority police officers. This study found that minority police officers are not only more likely to face disciplinary action by the Police Department, but also more likely to face harsher punishment. See *Fleming. v. City of New York*, 2006 WL 2322981 (S.D.N.Y. 2006).

35. A class action lawsuit was brought against the NYPD  in 1999. The matter was titled *National Latino Officer's Association et. al. v. City of New York*, et. al. in the Southern District of New York 1:99-cv-9568. This matter alleged, amongst other claims, that the NYPD had a pattern and practice of discrimination and retaliation related to disparate impact of the issuance of discipline and disciplinary penalties towards Hispanic and African-American police officers.

36. This class action lawsuit was ultimately settled in December 2003 and approved on September 17, 2004. As part of this settlement agreement, the minority class of officer and the City of New York agreed "[t]he New York City Police Department, as an equal opportunity employer, does not and will not allow discrimination based on actual or perceived race, color, national origin, ethnicity or any other reason prohibited by federal, state or local law."

37. Further, this settlement resulted in the creation of the NYPD's "Disciplinary Review Unit" to track and analyze whether minority members of the NYPD were being treated in a discriminatory manner when disciplined and an "Advisory Committee" to address employment discrimination and retaliation concerns, develop a "Know Your Rights" guide to the NYPD discipline system and enhance existing databases and create new databases to be relevant to analyzing whether or not discrimination was continuing in the NYPD

discipline system.

38. In 2007, the National Latino Officer's Association brought an action of contempt against the City of New York related to the continuing of discrimination within the NYPD and failure to implement the terms of the settlement agreement.

39. In their challenge, the National Latino Officer's Association state that minority officers are thirty-five percent (35%) more likely to receive informal discipline in the form of a 'Command Discipline' than White officers.

40. The challenge to the Class settlement states that minority members of the NYPD, following the settlement,  were 'much more apt to be the subject of formal discipline' including that they were much more likely to be investigated, found guilty and to receive harsher penalties when found guilty, than their white counterparts.

41. This motion was ultimately denied as, while discrimination persisted, the City of New York as part of the settlement agreement, did not warrant that racial discrimination would never again occur in the NYPD's disciplinary system and Plaintiff's did not meet the incredibly high burden to warrant a contempt order related to the settlement.

42. The Second Circuit Court of Appeals held that the class settlement did not impose strict liability for discrimination on the City of New York and that if minority police officers were being discriminated against through the NYPD's disciplinary system, they had the right to bring their own action.

43. Upon information and belief, the discriminatory application of discipline within the NYPD never ceased and continues to date.

44. Plaintiff is at a significant disadvantage in trying to bring this action as the NYPD previously went to great lengths to keep the disciplinary records of police officers confidential while hiding behind the now defunct law, Civil Rights Law §50-a.

45. As a result of Civil Rights Law §50-a, the NYPD has been able to mask the discriminatory and

disparate application of punishments between minority and white police officers from the public.

46. Despite this clear lack of transparency, Plaintiff is personally aware of three (3) similarly situated white police officer who were punished in a less severe manner than Plaintiff.

47. These officers are similarly situated to Plaintiff in every way in that they all hold the title of Police Officer, provide identical job functions and have identical job duties. The only difference between the white comparators and Plaintiff is race.

48. Upon information and belief, Mayor Bill de Blasio has been regularly apprised of and is aware of the disparate application of punishment within the NYPD and overall discrimination that is systemic throughout the NYPD.

49. Nevertheless, upon information and belief, Mayor Bill de Blasio has not publicly addressed the disparate application of punishment based on race, national origin or color within the NYPD or the system of ongoing and continuing discriminatory practices and harassment that give rise to the systemic racism and retaliatory practices.

50. Upon information and belief, Mayor Bill de Blasio has not taken any affirmative steps to date to curb the systemic racism, including disparate application of punishment, within the NYPD.

51. Upon information and belief, Former Commissioner James P. O'Neil, while Commissioner was regularly apprised of and became aware of the disparate application of punishment within the NYPD and overall discrimination that is systemic throughout the NYPD.

52. Nevertheless, upon information and belief, Former Commissioner James P. O'Neil did not publicly address the disparate application of punishment based on race, national origin or color within the NYPD nor the system of ongoing and continuing discriminatory practices and harassment that give rise to the systemic racism and retaliatory practices.

53. Upon information and belief, Former Commissioner James P. O'Neil did not take any affirmative steps to date to curb the systemic racism, including disparate application of punishment, within

the NYPD.

54. Upon information and belief, Police Commissioner Dermot Shea has been regularly apprised of and is aware of the disparate application of punishment within the NYPD and overall discrimination that is systemic throughout the NYPD.

55. Nevertheless, upon information and belief, Police Commissioner Dermot Shea has not publicly addressed the disparate application of punishment based on race, national origin or color within the NYPD or the system of ongoing and continuing discriminatory practices and harassment that give rise to the systemic racism and retaliatory practices.

56. Upon information and belief, Police Commissioner Dermot Shea has not taken any affirmative steps to date to curb the systemic racism, including disparate application of punishment, within the NYPD.

**Internal Affairs Bureau's Unconstitutional Use of Fraudulent Subpoenas**

57. Internal Affairs is an investigative bureau within the NYPD.

58. Internal Affairs is states that they are "dedicated to preserving integrity, which is critical to the function of the Police Department, and fighting corruption within the NYPD."

59. Internal Affairs helps to ensure "that trust by detecting, investigating, and bringing to justice the small number of New York City police officers and civilians who engage in misconduct and corruption."

60. Internal Affairs states that "while IAB's investigations are not made available to the public, the NYC Commission to Combat Police Corruption provides oversight and a level of transparency through continual evaluation of the NYPD's anti-corruption programs and efforts."

61. Internal Affairs on its face claims to be an arm of the NYPD that helps protect the Department but in reality they use their bully pulpit to attack officers that complain of discrimination, retaliation, unlawful policing and other protected activities that the NYPD views as internal

dissent.

62. Internal Affairs is given carte blanche within the NYPD related to their investigations.

63. Police Officers who are subjected to an Internal Affairs investigation face a litany of potential harm to their careers.

64. First, an officer who refuses to "testify or to answer questions relating to the performance of… official duties… will be subject to department charges, which would result in…dismissal from the Police Department.

65. Second, a finding by Internal Affairs that an officer intentionally made false statements subjects the officer "to disciplinary action [up to] and including dismissal.

66. Third, when an officer has reached a plea bargain concerning a violation of the NYPD Patrol Guide, if the officer is subject to another open investigation, "The processing of the recommended plea agreement may be delayed, withdrawn or amended while there is an independent processing of the open investigation or charges and specifications.

67. Fourth, if an officer with an open investigation files for retirement, the case will be resolved in an expedited manner, which allows the officer to retire but precludes resolution by plea bargain.

68. Fifth, Internal Affairs allegations- both substantiated and unsubstantiated- appear in the officer's Central Personnel Index ("CPI") entry, which affects the officer's level of discipline for future infraction and complicates an officer's requests for transfers or promotions.

69. Internal Affairs regularly engages in a pattern and practice of intimidation and retaliation against police officers as a result of their mostly unfettered power.

70. Internal Affairs regularly uses unconstitutional and often illegal means to investigate their employee police officers.

71. Internal Affairs, and as such the NYPD, had a policy of subpoenaing journalist records in an effort to acquire more information related to leaks in the NYPD. This policy ended in February

2020 after the NYPD was caught in their constitutional violating scheme.

72. Internal Affairs, and as such the NYPD, has a current policy of subpoenaing the records of their employee police officers through these fraudulent subpoenas. These subpoenas on their face appear to be legitimate but in reality they are a document typed by an officer within Internal Affairs and are made to look like legitimate subpoenas. These subpoenas are then issued without warrants, probable cause nor signature from a judge and sent to unsuspecting recipients as if they were genuine. The recipients often respond as they have received what appears to be a credible subpoena from the New York City Police Department.

73. Internal Affairs, and as such the NYPD, have a policy of serving fraudulent and baseless subpoenas in order to obtain records to investigate their employee police officers.

74. Police Officers have a reasonable expectation of privacy related to their private and personal records, including their phone records.

75. Police Officers are granted a reasonable right to privacy and free from unreasonable search and seizure as set forth by the 4th and 14th Amendments of the Constitution of the United States.

76. Defendants, during the normal course of business, regularly violate the constitutional rights of their employees through illegal and unconstitutional means. These actions are egregious and likely designed to oppress or to cause injury to their employees, including Plaintiff herein.

77. Internal Affairs has a pattern and practice of illegally obtaining phone records through fraudulent subpoenas for the purpose of discriminating and retaliating against police officers and those who speak out against the Department.

78. These allegations are common place and set forth in the matter of *Khazin v. City of New York*, (Eastern District of New York Docket No.: 1:17-cv-03779) and further referenced in the New York Daily News Article dated July 17, 2020 entitled "NYPD subpoenaed phone records of NYC reporter in effort to find department leaks" and the New York Post Article dated February 13,

2020, entitled "NYPD tried to subpoena NY Post reporter's Twitter account citing anti-terror law"

79. The matter of Khazin v. City of New York, the NYPD's Internal Affairs Bureau illegally obtained Sergeant Valentin Khazin's employment records through illegal subpoenas sent to American Airlines and to his cell phone provider in a coordinated effort to retaliate against Sergeant Khazin for his refusal to discriminate against his African American subordinate, Police Officer Dana Harge. Internal Affairs issued these fraudulent subpoenas as if Sergeant Khazin had committed a crime but in reality they were simply investigating whether he was engaging in off duty employment, which was previously approved by the NYPD.

80. The New York Daily News reports in an article dated July 17, 2020 that the NYPD's Internal Affairs Bureau, illegally, through the issuance of a fraudulent subpoena, obtained the telephone records of an unnamed New York Reporter in an effort to silence a "leak" within the NYPD.

81. After the NYPD illegally obtained the records of the reporter, Internal Affairs questioned a police officer whose phone number was found within the telephone records of the reporter.

82. The unidentified police officer was then questioned, identically to Plaintiff, under the threat of suspension.

83. The NYPD states explicitly in the New York Daily News story that the "subpoena was issued prior to the department change of its rules about acquiring phone and social media records of journalists earlier in the year."

84. Despite this statement, the NYPD was still engaging in their scheme to obtain records through fraudulent means.

85. The NYPD allegedly changed their rules towards obtaining records of journalists in February 2020 after it was reported  in the New York Post that the department tried to subpoena Twitter for the records of a New York Post Bureau Chief Tina Moore.

86. In the instance of Tina Moore, the NYPD attempted to cite a post 9/11 anti-terrorism law to trick Twitter into complying with the invalid and illegal subpoena.  The illegal subpoena directed Twitter to "produce all device and contact information associated with the user handle @Tinamoorereport as well as all the handle's connection history between October 9, and October 14, 2019. The illegal subpoena further tells Twitter not to inform the reporter for 90 days, so as to not interfere with the investigation.

87. This subpoena was illegal and not related to any real investigation.

88. After getting caught in their fraudulent scheme, the NYPD withdrew their subpoena.

89. Upon information and belief, the NYPD still implores the illegal policy of obtaining private records of police officers within its employ through these same illegal means.

90. The Defendants knowingly and consciously mislead the recipients of these fraudulent subpoenas in an effort to strong arm the recipient into turning over the records of their police officers so they can punish the officer with internal discipline. These requests are not related to any credible criminal investigation.

91. This was a wide spread and commonly known policy used in the NYPD's Internal Affairs Bureau until this policy was allegedly ended for journalist records in February 2020 but, upon information and belief, is still implored related to private records of police officers still employed by the NYPD.

92. Upon information and belief, Mayor Bill de Blasio has been regularly apprised of and is aware of the illegal actions of Internal Affairs within the NYPD during the course of their investigations into police officers.

93. Nevertheless, upon information and belief, Mayor Bill de Blasio has not publicly addressed the illegal actions of Internal Affairs within the NYPD during the course of their investigations into police officers nor the system of ongoing and continual constitutional violations of the protected

rights of police officers.

94. Upon information and belief, Mayor Bill de Blasio has not taken any affirmative steps to date to curb illegal actions of Internal Affairs within the NYPD during the course of their investigations into police officers nor the system of ongoing and continual constitutional violations of the protected rights of police officers.

95. Upon information and belief, Former Commissioner James P. O'Neil, while Commissioner was regularly apprised of and is aware of the illegal actions of Internal Affairs within the NYPD during the course of their investigations into police officers.

96. Nevertheless, upon information and belief, Former Commissioner James P. O'Neil did not address publicly the illegal actions of Internal Affairs within the NYPD during the course of their investigations into police officers nor the system of ongoing and continual constitutional violations of the protected rights of police officers.

97. Upon information and belief, Former Commissioner James P. O'Neil did not take any affirmative steps to stop illegal actions of Internal Affairs within the NYPD during the course of their investigations into police officers nor the system of ongoing and continual violations of the protected rights of police officers.

98. Upon information and belief, Police Commissioner Dermot Shea has been regularly apprised of and is aware of the illegal actions of Internal Affairs within the NYPD during the course of their investigations into police officers.

99. Nevertheless, upon information and belief, Police Commissioner Dermot Shea has not publicly addressed illegal actions of Internal Affairs within the NYPD during the course of their investigations into police officers or the system of ongoing and continuing constitutional violations of the protected rights of police officers.

100.   Upon information and belief, Police Commissioner Dermot Shea has not taken any affirmative

actions to steps to curb the illegal actions of Internal Affairs within the NYPD during the course of their investigations into police officers nor the system of ongoing and continuing constitutional violations of the protected rights of police officers.

101.   Upon information and belief, the issuance of fraudulent and deceitful subpoenas by Internal Affairs is not limited to the examples herein but is indicative of a broader pattern and practice accepted by the Defendants herein to the detriment of their employees whose constitutional rights are repeatedly violated.

**Discrimination against Plaintiff Efrain Santiago**

102.   Plaintiff joined the NYPD on August 31, 1998.

103.   On or around 2012, Plaintiff started working for a chauffeur service company owned by civilian Edwin Roa.

104.   Plaintiff obtained the necessary approval for "off duty employment" which is encouraged within the NYPD because it lessens the costs of the Department through an officer's diminished desire to work overtime, saving the City of New York money.

105.   Plaintiff worked for Mr. Roa on a couple of occasions, following approval from the NYPD, where he drove people to the airport and other locations throughout New York City. During the course of Plaintiff's NYPD approved off duty employment, there were no incidents or complications.

106.   In 2013, Plaintiff was contacted by a parole officer and asked how he knew Edwin Roa. Plaintiff responded that he was his employer at which time he was informed that Edwin Roa was a parolee.

107.   Plaintiff explained to the parole officer that Mr. Roa was his friend and business partner.

108.   Plaintiff had met Mr. Roa after he was incarcerated and was unaware of that Mr. Roa was a parolee.

109.  Plaintiff asked the parole officer if he had done anything wrong and was told that he had not.

110.  Plaintiff explained to the parole officer that he would have no further contact with Mr. Roa but explained that Mr. Roa was in possession of Plaintiff's vehicle.

111.  Plaintiff never worked for nor saw Mr. Roa again.

112.  Plaintiff was contacted by Internal Affairs approximately six (6) months later and a GO15 was held to determine the extent of the relationship between Plaintiff and Mr. Roa.

113.  Plaintiff explained to Internal Affairs that he had met Mr. Roa on the street after Mr. Roa broke up a fight between a man and a woman. Mr. Roa began talking to Plaintiff at which time he explained that he owned a chauffeur services company and that he was in need of a driver.

114.  Plaintiff was informed by Internal Affairs that what he did was wrong and against departmental guidelines.

115.  Plaintiff explained that he was unaware that Mr. Roa had a criminal history and apologized for the misunderstanding.

116.  Following the GO15 Plaintiff was issued charges and specifications for punishment for knowingly associating with a felon despite it being clear that Plaintiff was unaware of Mr. Roa's criminal history.

117.  These charges went before the Trial Board in 2014.

118.  In addition to being charged with "associating with a known felon" Plaintiff was also being punished for a faulty police accident report that his now retired partner had written.

119.  Plaintiff's former partner, John Blac, a Caucasian male, had improperly filled out an incident report in 2013. Officer Blac was more senior than Plaintiff and wrote the Police Accident Report without the knowledge of Plaintiff.

120.  After Officer Blac retired, Plaintiff was informed that he would have to take the punishment for the ineffective report of his White partner. Further, Plaintiff was told that if he did not accept

the penalty that he would be terminated from the Department.

121.   At the trial in 2014, Plaintiff was told that is he did not accept the docking of 40 days' pay (30 days for associating with a felon and 10 days for Police Accident Report) he would be terminated.

122.   Upon information and belief, White officers who are brought up on similar charges on average receive less of a penalty for the same offenses than Black and Hispanic Officers.

123.   In 2015, Plaintiff was again contacted by Internal Affairs. This time Plaintiff was accused of "lying" to the Department. Plaintiff was again given charges and specifications.

124.   At this second trial, Plaintiff learned that Internal Affairs was accusing Plaintiff of lying to the department.

125.   Plaintiff tried to explain to Internal Affairs that Mr. Roa had failed to return his vehicle that he lent him as part of the chauffer business, nor paid him for the which Mr. Roa and Plaintiff had previously agreed on. Plaintiff was receiving letters from credit agencies regarding the vehicle, which had approximately Seven Thousand Dollars ($7,000) remaining on the car loan.

126.   Plaintiff explained to Internal Affairs that he only tried contacting Mr. Roa to get his car back and/or be paid for his vehicle in order to avoid further adverse effects to his credit.

127.   Further, Plaintiff explicitly stated that he was not associating with Mr. Roa in anyway, which was truthful.

128.   Internal Affairs proceeded to charge Plaintiff with "associating with a known felon" and lying to a supervisor.

129.   Mr. Roa also worked with a police officer Hagen who is White.

130.   Internal Affairs was aware of the association between Hagen and Mr. Roa but Hagen was given a lesser punishment than Plaintiff as was allowed to retire on full benefits.

131.   Police Officer Hagen was similarly situated to Plaintiff and every way but for his race which is the reason why he received a lower penalty.

132.   On September 5, 2015, Plaintiff's sister served Plaintiff's child's mother, Wendy Ruiz, with child custody paperwork filed in Bronx County Supreme Court.

133.   Plaintiff waited in his vehicle while his went into Ms. Ruiz's apartment building to serve the paperwork.

134.   A few hours following successful process service, Plaintiff was contacted by the 43rd Precinct and asked to come to the precinct. At that meeting Plaintiff was informed that Ms. Ruiz had accused Plaintiff of domestic violence. Plaintiff was subsequently arrested and charged with 18 counts of domestic violence and trespassing.

135.   The arrest was effectuated by Sergeant Barry. Sergeant Barry stated at the time that the arrest did not make sense but was told by PBA Delegate Tony Sountis that the arrest had to be done. Sergeant Barry subsequently refused to fingerprint Plaintiff and even refused after he was Ordered by a Captain to complete the task. Plaintiff ultimately fingerprinted himself which caused him severe embarrassment and humiliation.

136.   Plaintiff was suspended for 30 days as a result of the arrest.

137.   Upon information and belief, this punishment was substantially harsh as a result of Plaintiff's race and that similarly situated White police officers would on average receive a lesser penalty.

138.   Following the arrest, Plaintiff was transferred to the New York Court in Manhattan as a form of "highway therapy" a common retaliatory practice in the NYPD.

139.   Highway therapy refers to an assignment of an officer to a place that is far away from their residence in order to maximize their travel time. This practice is a common form of punishment within the NYPD.

140.   Plaintiff was subsequently transferred to PSA 6.

141.   Plaintiff was again falsely arrested on November 2015, this time for allegedly violating an order of protection. This arrest, like the first, was baseless and the charges were promptly

dismissed by the Bronx County District Attorney's Office at the next court appearance.

142.   Plaintiff was again transferred in 2016, this time to the Bronx Viper Unit.

143.   It was subsequently revealed in Court that Ms. Ruiz suffered from severe anxiety and paranoia and that she had a history of seeing spirits according to disability Social Security records.

144.   In October 2017, Plaintiff was found not guilty of all 18 of the domestic violence charges at trial. Plaintiff was convicted of criminal trespass despite never entering the building he was accused of trespassing.

145.   The criminal trespassing charge is currently being appealed in the Appellate Division State of New York, 1st Department.

146.   Following the acquittal at trial, Plaintiff was informed by a Police Benevolent Union Trustee that the NYPD was angry with Plaintiff as they spent a considerable amount of time and overtime investigating him because they believed they had a major case related to the domestic violence case. Plaintiff was further told that he should be on the lookout for retaliation from the Department.

147.   Plaintiff was then informed that he was receiving charges and specifications for the domestic violence despite being acquitted at trial.

148.   Plaintiff was interviewed by Investigations. The interview was conducted by Sergeant Crystal and Lieutenant Shapiro. During this interview Plaintiff was told several times that the investigating officers would interview Plaintiff's sister as she could attest that she served Ms. Ruiz, no domestic incident transpired and that Plaintiff never entered Ms. Ruiz's apartment building.

149.   At a subsequent meeting in 2018 with Internal Affairs, it became clear that Plaintiff was being punished again for associating with Mr. Roa in addition to the domestic violence that Plaintiff had been acquitted.

150.   Internal Affairs, through phone records obtained illegally and without the consent of Plaintiff, informed Plaintiff that he had placed over 30 calls to Mr. Roa since the last departmental hearing.

151.   Plaintiff first became aware of the violations to his constitutional rights to privacy and freedom from unlawful search and seizure at this time.

152.   This meeting occurred in 2018 and was part of continuing conspiracy dating back to 2015 by the Defendants to violate the constitutional rights of the Plaintiff.

153.   The Defendants obtained the phone records of Plaintiff illegally.

154.   Plaintiff had a reasonable expectation of privacy related to his personal phone records.

155.   Plaintiff is granted a reasonable right to privacy and free from unreasonable search and seizure as set forth by the 4th and 14th Amendments of the Constitution of the United States.

156.   Defendants unconstitutional actions in obtaining Plaintiff's cell phone records through illegal means is egregious and is likely designed to oppress or to cause injury to Plaintiff.

157.   Plaintiff is entitled to a right to privacy in his personal life that is free from employer oversight.

158.   Internal Affairs obtained Plaintiff's personal phone records without a warrant.

159.   Internal Affairs obtained Plaintiff's personal phone records without probable cause.

160.   Upon information and belief, Internal Affairs obtained Plaintiff's personal phone records for internal discipline under the guise of a criminal investigation into Plaintiff yet no such criminal investigation existed.

161.   The Defendants knowingly and consciously mislead the recipients of these fraudulent subpoenas in an effort to strong arm the recipient into turning over the records the Plaintiff herein.

162.   Defendants knowingly, purposefully and recklessly violated the right to privacy and right from unreasonable search and seizure granted to Plaintiff as a citizen of the state of New York and the United States of America.

163.   As a result of these illegal actions, Plaintiff was damaged.

164.  Plaintiff explained to Internal Affairs again that Mr. Roa owed Plaintiff over Seven Thousand

   Dollars ($7,000) which had resulted in a collection agency coming after Plaintiff for the money

   he owed on the car controlled by Mr. Roa. Plaintiff further stated that he was not associating with

   Mr. Roa in anyway but was simply trying to collect the money that he was owed.

165.  Following this meeting, in early 2018, Plaintiff was made aware of the new charges from

   Internal Affairs, on two occasions, Internal Affairs officers, posing as Mr. Roa, attempted to

   contact Plaintiff in an effort to prove that Plaintiff had been associating with Mr. Roa. On each

   occasion after the Internal Affairs officers identified themselves as Mr. Roa, Plaintiff promptly

   hung up the phone.

166.  Plaintiff went to the NYPD trial room for the charges of domestic violence and associating

   with a felon.

167.  Plaintiff's sister appeared for the departmental hearing as a witness for Plaintiff. Plaintiff

   attempted to call his sister as a witness in his defense in the trial room but was denied this right.

168.  Upon information and belief, similarly situated White police officers are allowed to present

   witnesses in their defense in the Trial Room, a luxury not afforded to Plaintiff.

169.  The trial seemed predetermined from the outset.

170.  Following the trial, Plaintiff was sent back to the Viper Unit.

171.  On September 4, 2018, a week later, Plaintiff was informed that he was again being suspended

   for another thirty (30) days pending termination for associating with a known felon.

172.  Upon information and belief, this punishment was substantially harsh as a result of Plaintiff's

   race and that similarly situated White police officers would on average receive a lesser penalty.

173.  Further, Plaintiff never knowingly associated with Mr. Roa which negates these accusations

   and is indicative of the purposeful, deliberate and reckless disparate application of penalties

   towards minority police officers within the NYPD, including Plaintiff.

174.   Plaintiff put in his retirement papers in October 18, 2018, as he had worked over twenty (20) years as a Police Officer. Plaintiff retired with 82 vacation days and 12 military days accrued that should have counted towards his time as a police officer.

175.   Following notice of his retirement, the NYPD informed Plaintiff that he was being docked ninety (90) days as a result of the suspensions and as such he could not count his accrued vacation time towards his retirement.

176.   Plaintiff was arbitrarily subjected to this additional penalty despite having no active charges against him.

177.   Upon information and belief, this additional punishment is not given to similarly situated white officers but was given to Plaintiff as a result of his race.

178.   This additional penalty was contrary to the policies of the NYPD and were given to Plaintiff arbitrarily to ensure that he could not retire on full pension benefits.

179.   This equated to a total punishment of 120 days for associating with a felon.

180.   As a result of this additional punishment, Plaintiff was forced to retire with 19 years 10 months and 22 days, short of the twenty (20) year requirement, which made Plaintiff ineligible for his full retirement and corresponding benefits.

181.   Specifically, Plaintiff lost his "variable supplement" which equates to approximately $10,000 a year for the remainder of his life in addition to several other benefits which Plaintiff lost.

182.   Plaintiff was also not provided with his NYPD  identification card when he retired which severely hinders his ability to obtain employment following his retirement. The identification card is regularly asked for by prospective employers in order to verify that a job candidate worked as a police officer.

183.   Plaintiff was not provided with a cost of living adjudgment.

184.   Plaintiff was treated differently than similarly situated White Officers.

185.   Police Officer Robert Cox, a White officer, was docked only 20 days for "lying" to Internal Affairs about associating with a known felon on June 20, 2018, one hundred days less than Plaintiff.

186.   Plaintiff, a minority male, received six (6) times the penalty as his similarly situated White Comparator, Cox.

187.   Plaintiff, a minority male, received six (6) times the penalty as his similarly situated White Comparator, Hagen, who associated with the same felon Roa.

188.   Police Officer Hagen, a White Police Officer, who was also accused of associating with Mr. Roa, was allowed to retire with his full pension benefits including the variable supplement, cost of living adjustment and identification card, whereas Plaintiff, a minority officer, was not.

189.   Upon information and belief and based on Plaintiff's experience working for the NYPD, there are several other instances of White police officers, similarly situated to Plaintiff, that were punished less severe and granted greater benefits, both pension and otherwise, than Plaintiff based on his race.

190.   At all times relevant herein, the Defendants violated clearly established standards under the Fourth and Fourteenth Amendments of the United States Constitution as well as analogous provisions of the Constitution of the State of New York.

### COUNT I
### DISCRIMINATION
### IN VIOLATION OF
### TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

191.   Plaintiff re-alleges all paragraphs to this complaint and incorporates them by reference as fully set forth herein.

192.   Plaintiff alleges that Title VII of the Civil Rights Act of 1964 makes it unlawful to discriminate or retaliate against an individual on the basis of their race, national origin and color in violation of 42 U.S.C. §§2000e et seq.

193.        Defendants subjected Plaintiff to disparate treatment in the investigatory and

disciplinary process and dismissal of Plaintiff  of the NYPD in violation of Title VII.

194.        Defendants have and continue to discriminate and retaliate against Plaintiff due to

his national origin, race and color and his complaints of disparate application of punishment.

195.        Defendants implementation of terms and conditions of employment, including the

disparate disciplinary treatment of Plaintiff, violates 42 U.S.C. §2000e-3(a) which makes it

unlawful for an employer to discriminate and/or retaliate against any of its employees for

opposing unlawful employment practices or filing complaints of discrimination.

196.        Plaintiff has satisfied the procedural requirements of Title VII as a condition of

filling this action, in particular, Plaintiff filed a timely charge with the EEOC and filed the

complaint within ninety (90) days from receipt of the notice of right to sue on which this

lawsuit is based.

197.        Plaintiff has suffered and will continue to suffer irreparable injury caused by

Defendants' illegal conduct including interference with their civil rights, their right to speak

out against discrimination and to and to to be free of such discrimination based upon race, color,

and national origin.

198.        As a direct and proximate result of Defendants unlawful acts, Plaintiffs and

members of the class they represent have suffered and continue to suffer loss of employment,

loss of income, loss of other employment benefits including, and have suffered and continue

to suffer distress, humiliation, great expense, embarrassment, and damage to their

reputations.

199.        As a result of the forgoing, Plaintiff is entitled to compensatory damages pursuant

to Title VII in an amount to be determined at trial.

### COUNT II
**(42 U.S.C. § 1981)**

200.     Plaintiff re-alleges all paragraphs to this complaint and incorporates them by reference as fully set forth herein.

201.     This claim is brought under 42 U.S.C. §1981. Section 1981 provides in pertinent part that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, ... and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."

202.     A contract of employment exists and existed between Plaintiff and Defendant NYPD in that the Department and Plaintiff agreed that Plaintiff would be hired by the Department to work for it in a specific position described in the Complaint, at a specific average rate, for an indefinite period of time.

203.     Defendants denied Plaintiff his ability to earn his full pension as a result of his race, color and national origin.

204.     Defendants' actions as hereinbefore set forth also prevented Plaintiff from enjoying and enforcing his employment contract rights on the same basis as white persons, thereby denying said rights in violation of the Civil Rights Act of 1866, 42 U.S.C. Section 1981, as amended.

205.     Defendants' actions had both the intention and the effect of depriving Plaintiff of the rights and benefits of his contractual relationship with the Department on the basis of their race,

color and national origin.

206.     As a direct and proximate result of Defendants unlawful acts, Plaintiff has suffered and continues to suffer loss of employment, loss of pension benefits, loss of variable supplement, loss of income, loss of other employment benefits, and have suffered and continues to suffer distress, humiliation, great expense, embarrassment and damage to their

reputation.

207.　　　　Plaintiff has suffered and will continue to suffer irreparable injury caused by Defendants' illegal conduct including interference with his civil rights, his rights to speak out against discrimination and to be free of such discrimination based upon race, color and national origin.

208.　　　　The actions of Defendants, in depriving Plaintiffs of their constitutional and Civil Rights, as hereinbefore stated, were willful and malicious. As a result of Defendants' reckless and intentional acts, Plaintiff and members of their class are entitled to compensatory damages and punitive damages in an amount to be determined at trial.

209.　　　　Based on the foregoing, Plaintiff are entitled to compensatory and punitive damages against all individual Defendants in a sum to be determined at trial.

### **COUNT III**
### **(42 U.S.C. § 1983)**

210.　　　　Plaintiff re-alleges all paragraphs to this complaint and incorporates them by reference as fully set forth herein.

211.　　　　Defendants have engaged in a long standing pattern and practice of discriminating against Hispanic officers by inter alia, maintaining and allowing a hostile work environment, subjecting said officers to disparate treatment including but not limited to discrimination in the investigatory/disciplinary process, and the imposition of disciplinary penalties.

212.　　　　Defendants have, by the actions described herein, acted under the color of state law to discriminate against Plaintiffs on the basis of race and national origin, thereby depriving Plaintiff rights, privileges and immunities secured to them by the Constitution and laws of the United Stated and the State of New York, and in direct violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983 and such injury has been and will continue to be irreparable.

213.　　　　As a direct and proximate result of said acts, Plaintiff has suffered and continue to suffer loss of employment, loss of income, loss of other employment benefits, and have

suffered and continue to suffer distress, humiliation,. great expense, embarrassment, and damage to their reputations.

214.      The actions of Defendants, in depriving Plaintiff of his constitutional and Civil Rights, as hereinbefore stated, were willful and malicious. As a result of Defendants' reckless and intentional acts, Plaintiff is entitled to compensatory damages and punitive damages as to the individual Defendants in an amount to be determined at trial.

215.      At all times herein mentioned, the Defendants City of New York and the NYPD maintained a series of customs, policies and practices which proximately caused and continue to cause and which were likely to lead and continue to lead to the violation of Plaintiff's constitutional rights.

216.      These customs, policies and practices included among others, the following

   a.  The City's continuing failure to correct, prevent and eliminate discriminatory disciplinary practices and other discriminatory conditions of employment related thereto. This discrimination was known or should have been known to the Defendants City of New York and its policy-making leaders at all times mentioned herein.

   b.  The continuing failure to implement an order of the U.S. District Court for the Southern District of New York in the case of *United States of America v. New York City Police Department* (Goff)  which required the implementation of a series of practices and policies designed to eliminate discrimination in discipline;

   c.  The continuing failure to implement an order of the U.S. District Court for the Southern District of New York in the case of *National Latino Officers Association v. City of New York et. al.* which also required the implementation of a series of practices and policies designed to eliminate discrimination in discipline;

   d.  The continued refusal and/or failure on the part of the Defendants City of New York and NYPD, and its policy-making leaders, to fully and adequately discipline White

30

officers who have engaged in acts in violation of the NYPD's Patrol Guide, including racism against employees of the Department.

e.  The Defendants continue to engage in discrimination against minority officers within the Department.

## COUNT IV
### 42 U.S.C. §1983, Defendant's Violation of the Fourth Amendment

217.     Plaintiff re-alleges all paragraphs to this complaint and incorporates them by reference as fully set forth herein.

218.     Defendant, City of New York has implemented, enforced and/or sanctioned a policy, practice and/or custom of acquiring telephone records of police officers under their employ through the issuance of fake subpoenas in order to obtain private information on their employees.

219.     Employees of the Defendant, City of New York, enjoy a reasonable expectation of privacy related to their personal cell phone records.

220.     The Defendant City of New York, the NYPD and the NYPD's Internal Affairs covert efforts to obtain the personal phone records of Plaintiff violates the Fourth Amendment to the United States Constitution, which prohibits unlawful searches and seizures.

## COUNT V
### 42 U.S.C. §1983, Defendant's Violation of the Fourteenth Amendment

221.     Plaintiff re-alleges all paragraphs to this complaint and incorporates them by reference as fully set forth herein.

222.     Defendant, City of New York, the NYPD and specifically NYPD's Internal Affairs has implemented, enforced and/or sanctioned a policy, practice and/or custom of acquiring telephone records of police officers under their employ through the issuance of fraudulent subpoenas in order to obtain private information on their employees.

223.     Employees of the City of New York, including Plaintiff, enjoy a reasonable

expectation of privacy related to their personal telephone records.

224.        Employees of the City of New York, including Plaintiff, have an expectation that

their personal phone records will remain private.

225.        The Defendants covert efforts to obtain the personal phone records of Plaintiff and

other employees violates the privacy guarantees of the Fourteenth Amendment to the United

States Constitution.

### COUNT VI
**(42 U.S.C. §§ 1985 and 1986)**

226.        Plaintiff re-alleges all paragraphs to this complaint and incorporates them by

reference as fully set forth herein.

227.        Upon information and belief, Defendants have and continue to conspire with and

amongst each Plaintiff the rights, privileges and immunities, and the equal protection of the

laws to which they are entitled under the Constitution and laws of the United States in violation

of 42 U.S.C. §1985.

228.        As a direct result of this conspiracy, the Defendants injured Plaintiff and deprived

him of having and exercising their rights and privileges under the Constitution and laws of the

United States.

229.        The actions and omissions of Defendants described herein were willful and

malicious and based upon invidious racial and class based animus. The purpose of the

aforementioned conspiracy was to violate the constitutional rights of the Plaintiff and as such

violated 42 U.S.C. § 1985.

230.        All of the individual Defendants, as public officials, had notice of the conspiracy

set forth above, in violation of section 1985 and failed and refused to prevent, prohibit and

ameliorate the aforementioned conspiracies notwithstanding their abilities to do so. Said

failure and/or refusal to prevent, prohibit and/or ameliorate constituted a violation of 42 U.S.C

. § 1986.

231.     The actions of Defendants, in depriving Plaintiff of his constitutional and Civil Rights, as hereinbefore stated, were willful and malicious. As a result of Defendants' reckless and intentional acts, Plaintiff is entitled to compensatory damages and punitive damages in an amount to be determined at trial.

## COUNT VII
### (New York State Human Rights Law)

232.     Plaintiff re-alleges all paragraphs to this complaint and incorporates them by reference as fully set forth herein.

233.     This claim is brought pursuant to the supplemental jurisdiction of this Court, under NYSHRL, Executive Law§§ 290 et seq.

234.     Executive Law § 290 provides in pertinent part that "the opportunity to obtain employment without discrimination because of race or national origin is hereby recognized as and declared to be a civil right."

235.     The New York State Human Rights Law prohibits employment discrimination  and retaliation on the bases of race, national origin and color.

236.     Plaintiff is a member of a protected class as defined by New York Executive Law §296.

237.     Defendants subjected Plaintiff to discriminatory and retaliatory conduct in the form of unfounded, unwarranted and improperly conducted disciplinary investigations including the misuses of integrity tests interrogations, unfounded and unwarranted referrals for psychological evaluations, unfounded, unwarranted overly severe disciplinary penalties including termination, all of which were not conducted or imposed on comparable white officers in the same manner, frequency and/or degree. This conduct was based on Plaintiffs' race or national origin.

238.     Defendants' practice of imposing adverse working conditions on Hispanic and African-American employees, and their practice of imposing disparate disciplinary treatment

and penalties on Plaintiffs and members of the class they represent on the basis of their race and national origin, has created a hostile working environment.

239.     Defendants' discriminatory actions against Plaintiff constitute unlawful discrimination in employment on the basis of race and national origin in violation of New York Executive Law §290.

240.     Plaintiff reported and complained of such conduct and supported other similarly situated employees complaints, and informed supervisory employees of Defendant NYPD of the unlawful conditions to which they were subjected.

241.     As a result of Plaintiffs' race and national origin, Plaintiff was subjected by Defendants to harassment including but not limited to unwarranted investigatory and disciplinary action in retaliation for Plaintiffs' exercising their rights under the Constitution and laws of the United States and the State of New York in violation of the NYSHRL, Executive Law § 296.

242.     Plaintiff has suffered and will continue to suffer irreparable injury caused by Defendants' illegal conduct including interference with his civil rights, their rights to speak out against discrimination and to be free of such discrimination based upon race and national origin.

243.     As a direct and proximate result of Defendants' unlawful acts, Plaintiff has suffered and continue to suffer loss of employment, loss of income, loss of other employment benefits including, and have suffered and continue to suffer distress, humiliation, great expense, embarrassment, and damage to their reputations.

244.     The actions of the Defendant, in depriving Plaintiff of his constitutional and Civil Rights, as hereinbefore stated, were willful and malicious. As a result of Defendants' reckless and intentional acts, Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial.

## COUNT VIII
### (New York State Human Rights Law)

245.        Plaintiff re-alleges all paragraphs to this complaint and incorporates them by reference as fully set forth herein.

246.        Defendants NYPD and City of New York as employers, pursuant to the New York City Human Rights Law, have unlawfully discriminated and retaliated against Plaintiff because of his race, color and national origin in the terms, conditions, and privileges of employment and disciplined, discharged and otherwise taken adverse action against Plaintiffs in violation of New York City Local Law 59 or 1986 as amended by Local Rule 39 or 1991, § 8-107.

247.        Plaintiff has suffered and will continue to suffer irreparable injury caused by Defendants' illegal conduct including interference with their civil rights based on his race, color and national origin.

248.        As a direct and proximate result of the Defendants' unlawful acts Plaintiff has suffered and continues to suffer loss of employment, loss of income, loss of other employment benefits, and have suffered and continue to suffer distress, humiliation,. great expense, embarrassment, and damage to their reputations.

249.        The actions of Defendants, in depriving Plaintiff his constitutional and Civil Rights, as hereinbefore stated, were willful and malicious. As a result of the Defendants' reckless and intentional acts, Plaintiff is entitled to compensatory damages and punitive damages to be determined at trial.

## COUNT IX
### 18 U.S.C. §1367 (a), Defendant's Violations of Plaintiff Right Against Unreasonable Search Under N.Y. Const. art. I §12

250.        Plaintiff re-alleges all paragraphs to this complaint and incorporates them by reference as fully set forth herein.

251.        Defendant, City of New York has implemented, enforced and/or sanctioned a policy, practice and/or custom of acquiring telephone records of police officers under their

employ through the issuance of fake subpoenas in order to obtain private information on their employees.

252.    Employees of the Defendant, City of New York, enjoy a reasonable expectation of privacy related to their cell phone records.

253.    The Constitution of the State of New York art. I, §12 prohibits unreasonable searches and seizures. It is analyzed coextensively with, and sometimes more broadly than, the Fourth Amendment of the United States Constitution.

254.    The Defendants covert efforts to obtain the personal phone records of Plaintiff and other employees violates the N.Y. Const. art. I  §12.

<u>**COUNT X**</u>
**18 U.S.C. §1367 (a), Defendant's Violations of Plaintiff Right Against Unreasonable Search Under N.Y. Const. art. I § 6**

255.    Plaintiff re-alleges all paragraphs to this complaint and incorporates them by reference as fully set forth herein.

256.    Defendant, City of New York has implemented, enforced and/or sanctioned a policy, practice and/or custom of acquiring private telephone records of police officers under their employ through the issuance of fake subpoenas in order to obtain private information about their employees.

257.    Employees of the Defendant, City of New York, enjoy a reasonable expectation of privacy related to their cell phone records.

258.    The Constitution of the State of New York art. I, §12 guarantee's a right to privacy coextensively with, the due process clause of the 14th Amendment of the United States Constitution.

259.    The Defendants covert efforts to obtain the personal phone records of Plaintiff and other employees violates the N.Y. Const. art. I  §12.

## JURY TRIAL

260.         Plaintiff demands a trial by jury of all issues in this action that are so triable.

## PRAYER FOR RELIEF

261.   WHEREFORE, Plaintiff respectfully request that the Court:

f.   Award compensatory damages for the pain, suffering, emotional distress, loss of

dignity, humiliation, and damages to reputation and livelihood endured by Plaintiff

in an amount to be determined at trial;

g.   Award Plaintiff punitive damages in an amount to be determined at trial;

h.   Award Plaintiff costs for this action and reasonably attorneys' fees, as provided for

in 42 USC §1988 and 42 USC §2000e-5(k) and;

i.   Grant Plaintiff such other and further relief as may be required in the interest of

justice.

Dated: August 4, 2020

New York, NY

Respectfully submitted,

By:____/s/_____
       John Scola

Law Office of John A. Scola, PLLC
Attorneys for Plaintiff
30 Broad Street Suite 1424
New York, New York 10004
(917) 423-1445
jscola@johnscolalaw.com